UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

PETER BRASSELER HOLDINGS, L.P.,
and BRASSELER USA, INC.,

Plaintiff,

v. 407CV025

GEBR. BRASSELER GmbH & Co. KG, KOBRA,
INC. d/b/a/ KOMET USA, and KOMET USA, LLC,

Defendants.

AMENDED 11/21/07 ORDER[1]

## I. INTRODUCTION

Peter Brasseler Holdings, L.P. and Brasseler USA, Inc.[2] (hereafter for convenience, BUSA) brought this unfair trade practices case against Gebr. Brasseler GmbH & Co. KG, Kobra, Inc., d/b/a/ Komet USA, and Komet USA, LLC (hereafter for convenience, GBL). Doc. # 1, *as amended*, doc. ## 26, 68. After a preliminary injunction hearing, doc. # 27 (transcript) and Preliminary Injunction Order, doc. # 36, BUSA sought another preliminary injunction, while GBL now seeks one of its own. Doc. ## 73, 80, 98-103. Following an 11/15/07 hearing, the issue is now ripe for disposition.

In a nutshell, both BUSA and GBL are suing each other for trademark infringement, "false advertising," etc. *See* doc. # 68 (BUSA's Amended Complaint, Count One: "Lanham Act - False Advertising"; Count Two: "Lanham Act - False Designation of Origin"; Count Three: "Lanham Act - Trademark Infringement"; Count Four: "Lanham Act - Trade Dress"); Counts Five - Eleven: Georgia state law claims); Count Twelve: Injunctive Relief; Count Thirteen: "Punitive Damages"; Count Fourteen: "Accounting"; Count Fifteen: "Breach of Contract"; *see also* doc. # 70 (GBL's Answer and Counterclaim alleging Lanham Act, Copyright Act, etc., violations).

## II. BACKGROUND

Brasseler USA and GBL are in the dental tools business; both parties sell, *inter alia*, dental drill bits, or "burs." Pursuant to an "exclusive supply agreement," BUSA was the sole marketer of GBL-manufactured burs in the United States. But that agreement ended on 12/31/06, at which point GBL entered the U.S. bur sales market, through its "Komet" subsidiary. Doc. # 70 at 4 ¶ 3.

That's when the troubles in this case began. BUSA charges GBL with, *inter alia*, infringing its trademarks and breaching prior agreements that turned on hemispheric-market divisions and intellectual property rights ownership. GBL, in turn, alleges that customer confusion has arisen over who actually has manufactured specific dental tools, who is now manufacturing them, etc. Doc. ## 58, 70.

GBL insists that, in this particular market, "manufacturing provenance" means a lot to dentist customers, so misleading advertising about a product's lineage, it argues, can cause market harm. Doc. # 98. The parties have lobbed a lot of paper and documents at the Court, but what is dispositive here is the agreement reached when a brother and sister

---

[1] The Court originally entered this Order on 11/21/07, doc. # 109, but the Court sealed it at that time because the Court had quoted from sealed documents. Within that Order the Court gave the parties 10 days to object to the Order's unsealing. Doc. # 109 at 13. In that no one has objected in that period, the Court is re-issuing doc. # 109 unsealed and with minor stylistic changes.

[2] "Brasseler USA, Inc. is a corporation organized and existing under the laws of the state of Delaware, with its principle place of business located in Savannah, Georgia, and is the general partner in Peter Brasseler Holdings, L.P." Doc. # 26 at 1; # 58 ¶ 1.

divided a family business.[3]

From the documents and 11/15/07 hearing evidence the Court finds that Peter Brasseler, Sr. founded GBL in Germany 1923. Doc. # 68 ¶ 16; # 70 at 5 ¶ 16. His son, Peter Brasseler, Jr. founded Brasseler USA in Chicago in 1976 as a subsidiary to GBL. Doc. # 68 ¶ 18; doc. # 107 at 1. GBL "admit[s] that [BUSA], as a subsidiary of GBL or one of its related entities, was the first to use the mark BRASSELER USA in commerce in the United States and that [BUSA] has been using said mark in commerce in the United States since 1976." Doc. # 70 ¶ 45.[4]

In 2000, the companies split, and under a 2002 Supply Agreement that ended 12/31/06, BUSA retained the exclusive right to sell GBL-manufactured burs in what the parties call the "UCM" ("United States, Canada, Mexico, Puerto Rico and Bermuda"), but this right was not reciprocal. Doc. # 1 ¶¶ 22-23; # 58 ¶¶ 22-24 (Answer admitting these allegations); # 27 at 7-8. GBL "admit[s] that, under the Supply Agreement, [BUSA] could sell dental products manufactured by other companies and that [BUSA] sold certain dental products manufactured by other companies." Doc. # 70 ¶ 25. During the 2002-06 Supply Agreement period, GBL sold dental products under the Komet name outside of the UCM. Doc. # 68 ¶ 30; # 70 ¶ 30.

Prior to the termination of the Supply Agreement GBL began planning for the possibility that, after termination, GBL would sell dental rotary instruments directly to the United States market. Doc. # 68 ¶ 30; # 70 ¶ 30. In fact, in 11/05, it hired a former BUSA Chief Operations Officer for GBL's U.S. operations. Doc. # 68 ¶ 31; # 70 ¶ 31. GBL also hired other ex-BUSA employees. Doc. # 68 ¶ 34; # 70 ¶ 34. To enter the U.S. market, GBL in 11/06 formed New Bur USA, LLC, but later changed its name to KOMET USA, LLC. Doc. # 1 ¶¶ 35-36; # 58 ¶¶ 35-36; # 68 ¶¶ 36-37; # 70 ¶¶ 36-37.

BUSA complains that, upon GBL's entry into the U.S. market, it misrepresented that KOMET was "well established in the U.S. dental market," that BUSA had sold GBL's products since 1983, and that GBL had been BUSA's exclusive supplier. Doc. # 68 ¶ 40. BUSA also complains that GBL's salespeople have misrepresented that BUSA has been acquired by GBL and that customers may only purchase BUSA products through KOMET. Doc. # 68 ¶ 41; *see also* doc. # 95 Appx. (Majewski Aff.). Too, that by using the term "BRASSELER," GBL has created customer confusion. Doc. # 68 ¶ 41.

GBL, in that regard, admits that BUSA,

as a subsidiary of GBL or one of its related entities, was the first to use the mark BRASSELER USA in commerce

---

[3] The parties entered into a series of agreements: The Preliminary Agreement of July 2000, doc. # 80 exh. 6; The 8/28/00 Spin-Off Agreement, doc. # 91 exh. 1 of exh. B (Wethmar Aff.); and their 9/19/00 Separation Agreement, doc. # 91 exh. 2 (Wethmar Aff.). *See* doc. # 107 (Stipulation). The parties have since stipulated that

> Between [1/1/02] and [12/31/06] the relationship between GBL and [BUSA] was governed by the[ir] Supply Agreement and the Trademark Agreement.

Doc. # 107 ¶ 4.

[4] Admissions in Answers, including prior Answers, constitute binding, judicial admissions. *See Mopex, Inc. v. Barclays Global Investors, N.A.*, 2003 WL 880996 at * 2 (N.D.Ill. 3/5/03) (unpublished).

in the United States and that [BUSA] has been using said mark in commerce in the United States since 1976.

Doc. # 70 ¶ 45. GBL also admits that the mark BRASSELER USA is a registered trademark with the USPTO, Registration No. 2,802,841. Doc. # 68 ¶ 46; # 70 ¶ 46.

GBL agrees that, except as permitted by the Supply Agreement, GBL made no sales or deliveries within the United States of any product except to Brasseler USA, Inc. until after 1/1/07. Doc. # 107 ¶ 5. After that date, GBL, through its "Komet" subsidiary, entered the U.S. market as BUSA's direct competitor. *Id.* ¶ 6.

This litigation then erupted, and much of it turns on trademarks and trade dress issues. BUSA complains that GBL has unlawfully used its trademarks. It insists that it was the first to use in U.S. commerce the marks "VARIO and CERAPOST for root posts, CRF for diamond rotary dental instruments, and CENTURY PAK for packaging of various rotary instruments, and [that BUSA] has used these marks continuously and exclusively in the [U.S.]." Doc. # 68 ¶ 48.

GBL denies this, claiming that GBL conceived of and was the first to use the marks "VARIO" and "CERAPOST" anywhere, and in commerce which Congress may regulate, in connection with dental products. Doc. # 70 ¶ 48. In fact, to the extent that BUSA has used the marks "VARIO", "CERAPOST" and "CRF" in connection with GBL-manufactured goods as a subsidiary of GBL and/or as GBL's U.S. distributor prior to the 12/31/06 expiration of the parties' Supply Agreement, that use inured to GBL's benefit as the rightful owner of the mark, and did not establish rights in BUSA. Doc. # 70 ¶ 48.

BUSA advances similar claims with other products and marks. Doc. # 68 ¶¶ 50-51 ("U.S consumers have come to associate the marks VARIO, CERAPOST, CENTURY PACK, CRF, Q, E, GE, SGE, EUF, DF, UM, UK, FSQ, and GSQ exclusively with Brasseler USA. Brasseler USA was the first to use the mark E-CUTTERS in commerce in the United States, and has been using the mark E-CUTTERS continuously and exclusively in commerce since 1982").

BUSA also complains, as a trade dress infringement, that GBL's "Komet" catalog is confusingly similar to BUSA's. Doc. # 70 ¶ 59.

BUSA emphasizes that its most current versions, "Seven" and "Eight," are used regularly by its customers. BUSA produced seven in 2001, and since 2002 it has created and revised eight. Mostly "Version Eight" goes to its customers, but "Version Seven" is also still used by most of its customers, too. Doc. # 68 ¶¶ 60-63.

Yet in early 2007 GBL, BUSA alleges, began distributing to U.S. dentists and other customers, including BUSA's, a Komet catalog "which incorporates much of the layout of [BUSA's] Version Seven and the same use of illustrations as [BUSA's] Version Eight, presenting [GBL's/Komet's] dental products, including carbide and diamond cutting instruments for clinical use on a patient's teeth." Doc. # 68 ¶ 66.

GBL admits that it began distributing its own catalog in 2007, but denies infringement. Doc. # 70 ¶ 66. BUSA, meanwhile, is upset because its customers are suffering confusion. Doc. # 68 ¶ 67; doc. # 95 Appx. (Akin Aff.).

As for specific dental tool products, the

3

parties have stipulated:

> The first use in the United States of the mark VARIO in connection with dental products sold by [BUSA] was in 1990.
>
> The first use in the United States of the mark CERAPOST in connection with dental products sold by [BUSA] was in 1996 or 1997.
>
> The first use in the United States of the terms CENTURY PACK and CENTURY PAK in connection with dental products sold by [BUSA] was in 1989.
>
> The first use in the United States of the term CRF in connection with dental products sold by [BUSA] was in 1992.
>
> Komet USA does not sell products using the term CENTURY PAK.
>
> CRF stands for "Cuts Real Fast" or "Cuts Really Fast."
>
> Version 7 of the Brasseler USA, Inc. catalog was a derivation of Version 6 which was published in 1997.

Doc. # 107 ¶¶ 7-14.

As this Court previously noted, Komet's initial round of 2007 advertising created the issues involved in this case. Komet, BUSA complains, sent letters to dentists and published an advertisement in a dental trade journal claiming that

> KOMET products are well established in the US dental market. Since 1983, they have been sold in the U.S. by Brasseler USA. The exclusive supply agreement between the manufacturer and Brasseler USA expired at the end of 2006. Now the products the dentist has come to know over the years will be sold in the U.S. directly from the manufacturer. With sales and marketing activities located in Rock Hill, SC, KOMET now offers their complete line of advanced dental rotary instruments and systems in the United States under a new name -- KOMET USA.

Doc. # 13, exh. B (advertisement); *see also id.*, exh. C (letter making similar statements).

In addition, says BUSA, "[n]ationwide, [GBL/Komet's] salespeople have made false statements that Brasseler USA has been purchased by GBL or someone else, that Komet is the parent company of Brasseler USA, that Brasseler USA will soon be out of business as it can no longer supply products now distributed by Komet, and/or that it cannot supply all of its products." Doc. # 14 at 5.

On 3/30/07, the Court entered its first Preliminary Injunction Order prohibiting GBL from (1) "Making or publishing any statements that [BUSA] is out of business or will soon be out of business;" (2) "Making or publishing any statements that [BUSA] can no longer supply burs or other dental products;" (3) "Making or publishing any statements that Komet or GBL is the parent company of [BUSA];" and (4) "Making or publishing any statement that discusses the 'exclusive supply agreement' without clarifying that GBL was one of multiple manufacturers of [BUSA] burs." Doc. # 36 at 6.

GBL, meanwhile, has F.R.Civ.P. 13-Counterclaimed, doc. # 58, # 70 at 33, alleging that BUSA was a subsidiary of GBL or one of

4

GBL's related entities for all or most of the period from 1976 until the end of 2000. And BUSA, GBL further alleges, held itself out as a subsidiary of GBL from 1976 until the end of 2000. Doc. # 58 Counterclaim ¶¶ 14-15. GBL cites the same 5/1/02 - 12/31/06 GBL-BUSA the Supply Agreement in alleging that BUSA was GBL's the exclusive U.S. dental products distributor during that periods. *Id.* ¶¶ 16-17.

GBL then complains that BUSA has violated the Lanham Act's prohibition against false advertising because more than 95% of the rotary dental instruments that BUSA sells are purchased from third parties, including GBL. Yet, BUSA continues to use the false and misleading advertising slogan, "Expect the Best. Buy Direct." Doc. # 58 Counterclaim ¶¶ 22-23.

GBL also takes issue with BUSA's recently distributed print advertisement announcing "The Original Peter Brasseler Series Diamond Range." An image of Peter Brasseler, Jr. appeared next to the headline. But he is not the "original" Peter Brasseler, nor is he the founder of GBL ("Sr." is). And again, BUSA does not manufacture diamond instruments. *Id.* ¶ 24. Also, GBL complains, BUSA's "advertising claim that the diamond instruments they sell are 'based on unique instrument design specifications developed by our founder, Peter Brasseler' is literally false." *Id.* ¶ 25.

As for BUSA's claim that the diamond instruments it sells are "based on unique instrument design specifications developed by our founder, Peter Brasseler," GBL says this is misleading in that it implicitly conveys a false impression or is misleading in context. *Id.* ¶ 26.

Those and similar misleading ads, GBL contends, "misrepresen[t] the nature, characteristics, qualities, or geographic origin of the goods that [BUSA] advertise[s] and sell[s]. *Id.* ¶ 30. These false and misleading advertising claims, GBL insists, "have actually deceived or had the capacity to deceive purchasers of dental instruments." *Id.* ¶ 31. And, they are likely to affect the purchasing decisions of consumers of dental instruments. *Id.* ¶ 32. BUSA thus, GBL concludes, is acting with willful intent to deceive U.S. customers, and this competitively prejudices GBL. *Id.* ¶¶ 34-35.

GBL also raises a copyright infringement claim against BUSA, alleging that when BUSA was a GBL subsidiary, and/or during the time that BUSA served as GBL's U.S. distributor, GBL provided BUSA with a number of technical drawings depicting various GBL products. *Id.* ¶ 37. These technical product drawings were works for hire created by German citizens and employees of GBL and are owned by GBL. *Id.* ¶ 38. They were never disseminated publicly or otherwise published, as that term is defined by the Copyright Act, and the drawings contain copyrightable material wholly originated by GBL. *Id.* ¶ 38. Yet, without GBL's consent, BUSA has copied and edited the product drawings for its own use, both electronically and by hand. *Id.* ¶ 39.

GBL next alleges that, during the time BUSA was a subsidiary of GBL and/or during the time that BUSA served as GBL's U.S. distributor, the product photographs and illustrations were provided to BUSA for use in U.S. catalogs featuring GBL products of which BUSA was an exclusive distributor. *Id.* ¶ 42. Yet, BUSA's current catalog continues to feature the product photographs and illustrations owned by GBL. *Id.* ¶ 43. GBL reminds that it did not consent to BUSA's use of these product photographs and illustrations following the termination of the Supply Agreement between the parties. *Id.* ¶ 44.

GBL concludes that BUSA's reproduction of the technical product drawings and product photographs and illustrations violates an exclusive right of GBL under 17 U.S.C. § 106. *Id.* ¶ 55. This is compounded by BUSA's use of the drawings in a BUSA catalog. *Id.* ¶ 57.

GBL thus (in its Counterclaim, not in its preliminary injunction motion) seeks injunctive relief, actual damages and entitlement to BUSA's profits arising from its infringing activities, *i.e.*, the profits associated with the sale of products created from GBL's product drawings and from BUSA's copied drawings. *Id.* ¶ 60.

Next, GBL pursues BUSA for violating its copyright by using GBL-owned and copyrighted photos in a BUSA website promotional video documenting the history of the company. The photographs constitute copyrightable material, GBL insists, wholly originated by GBL. This also constitutes a copyright infringement. *Id.* ¶¶ 62-63.

In Count IV, GBL sues BUSA for breaching a Supply Agreement provision obligating BUSA, GBL alleges, to return to GBL its product drawings and photographs provided to BUSA under the Supply Agreement. *Id.* ¶¶ 74-78. Count V advances a Conversion claim: "BUSA obtained and exercised dominion and control over GBL's product drawings and photographs. To the extent BUSA's possession of the drawings and photographs was initially obtained through GBL's consent, that consent has since been expressly withdrawn." *Id.* ¶ 81.

And in Count VI, GBL raises a Lanham Act Trademark Infringement claim, alleging that

> Prior to [BUSA's] first use of the marks "E-CUTTER", "E", "DF", "SGE, "GE", FSQ", "EUF", "UM", "UK" and "GSQ" in the United States, GBL conceived of and has been using the marks "E-CUTTER", "E", "DF", "EF", "SGE", "GE", "FSQ", "SGEA", "EA", "EUF", "UM", "UK" and "GSQ" in connection with its rotary dental instruments. Such prior use by GBL occurred outside of the United States and in commerce which Congress may regulate.
>
> GBL or its agent for GBL's benefit conceived of the mark "ET." GBL has been using the mark "ET" outside of the United States and in commerce in the United States (through BUSA) in connection with its rotary dental instruments.
>
> Prior to [BUSA]s first use of the mark VARIO" in the United States, GBL conceived of and has been using the mark "VARIO" in connection with its root posts. Such prior use by GBL occurred outside of the United States and in commerce which Congress may regulate.
>
> Prior to Counter-Defendants' first use of the mark "CERAPOST" in the United States, GBL conceived of and has been using the mark "CERAPOST" in connection with its root posts. Such prior use by GBL occurred outside of the United States and in commerce which Congress may regulate .
>
> On November 8, 2006, GBL filed an Intent to Use application with the United States Patent and Trademark Office for the mark "CERAPOST" (Serial No. 77/039,633) for use in connection with "surgical and diagnostic apparatus and

instruments" for various dental and other surgeries.

*Id.* ¶¶ 88-92. GBL then goes on to recount a large variety of alleged Trademark Infringement violations, all based on its claim that it has timely made United States Patent and Trademark Office filings, and that any such filings by BUSA that negate GBL's claims are neutralized by the fact that when it did so BUSA was GBL's subsidiary, so the trademark protection by definition inures to GBL's benefit.

Also, GBL contends that it owns a variety of marks, now used by BUSA, through their first use in this country. *See, e.g.*, doc. # 58 ¶ 109 ("To the extent [BUSA has] used the marks "E-CUTTER", "E", "DF", "SGE", "ET", "GE", "VARIO", "CERAPOST", "FSQ", "EUF", "UM", "UK", and "GSQ" in connection with GBL-manufactured goods in its role as a subsidiary of GBL and/or as GBL's U.S. distributor prior to the expiration of the parties' Supply Agreement on December 31, 2006, [GBL's] use inured to the benefit of GBL as the rightful owner of the mark and did not establish rights in [BUSA] to the marks").

GBL also seeks "Trademark Cancellation," doc. # 58 (Count VII), alleging that GBL conceived of and has been using the mark "E-CUTTER" outside of the U.S. and in commerce which Congress may regulate, continuously and prior to BUSA's purported first use of the mark in the U.S. in 1982. *Id.* ¶ 116.

GBL's next claim is somewhat complicated. It says that BUSA purported to first use the mark "ECUTTER" in 1982, and later registered it in 1995. Up until 1/1/07, then, BUSA's use of that mark was in association with GBL-manufactured products, in its status as a subsidiary of GBL and/or distributor of GBL-manufactured products. Thus, GBL contends, any use of the mark by BUSA inured to GBL's benefit as the mark's rightful owner, and therefore did not establish rights in BUSA. *Id.* ¶ 117. GBL alleges the same for the "ET" mark. *Id.* ¶ 118.

Because BUSA was not the owner of the marks "E-CUTTER" or "ET" at the time it registered the marks with the United States Patent and Trademark Office, GBL concludes, such registration was fraudulently procured and thus the "E-CUTTER" and "ET" trademarks should be cancelled and this Court should declare GBL their owner. *Id.* ¶¶ 119-120.

GBL, like BUSA, also brings state law, unfair-competition based claims, doc. # 58 (Counts VIII & IX), then seeks a 28 U.S.C. § 2201-based Declaratory Judgment that under ¶ 3.3 of the parties' Trademark Agreement, BUSA

> consent[ed] to GBL's use of the name "Brasseler" (but not "Brasseler USA", or "Brasseler US") inside the UCM only as a trade name, a company name, or part of a company name (not as a trademark or service mark) on packages, stationery and/or business cards along with the address of the company, which address shall always be outside the UCM, to provide information regarding the manufacturer, distributor, or reseller or place of origin of its respective products, and as otherwise agreed to in writing by the parties.

*Id.* ¶ 133.

GBL complains that, despite BUSA's having given its consent to GBL's use of the

7

name and address of GBL in Germany on packaging in the U.S., BUSA has notified GBL that it considers such use to be a breach of the Trademark Agreement and violation of BUSA's "BRASSELER" trademark. *Id.* ¶ 137. GBL insists that GBL's use of the name "BRASSELER" on its packaging in the U.S. as part of GBL's name and address does not constitute trademark usage, so it seeks a declaration to that effect. *Id.* ¶ 138. Nor does it violate the parties' Trademark Agreement. *Id.* ¶ 139.

At the same time, GBL contends that the use of the KOMET USA name and address on the GBL website does not violate the Trademark Agreement, and thus it seeks a declaration of the same. *Id.* ¶ 142. GBL says that it maintains a link from its Komet website to the Brasseler website, but this does not constitute trademark usage of the mark "BRASSELER" and is not a violation of the Trademark Agreement. So, GBL seeks a declaration on that score, too. *Id.* ¶ 146.

Like BUSA, GBL also seeks injunctive relief: To "enjoin [BUSA] from making false or misleading claims regarding [BUSA's] status as a manufacturer or direct supplier of [BUSA's] products, and regarding the 'originality' of [its] products and the series from which they derive, pursuant to 15 U.S.C. § 1116...." Doc. # 58 at 45. It also wants this Court to enjoin any further copyright violations, *id.*, and seeks the cancellation of BUSA's registration of the "E-CUTTER" and "ET" trademarks. *Id.* And, it seeks various damages and other forms of relief. *Id.* Like BUSA (doc. # 80), then, GBL thus moves for a preliminary injunction, doc. # 73, though for now it limits its motion to reached BUSA's alleged false advertising.

The Court has exhaustively detailed the depth and intensity of this "family feud" to demonstrate why the injunctive relief ruling here will not end this litigation, much less resolve all of the issues. For that matter, the record is fact-rich and weighted down with foreign-translations and agreements in part driven by things like German tax law considerations.

### III. ANALYSIS

#### A. Preliminary Injunction Standards

The Eleventh Circuit has established standards to be used in this context:

> A party seeking a preliminary injunction for trademark infringement must establish four elements: (1) substantial likelihood of success on the merits; (2) that it would be irreparably harmed if injunctive relief were denied; (3) that the threatened injury to the trademark owner outweighs whatever damage the injunction may cause to the alleged infringer; (4) that the injunction, if issued, would not be adverse to the public interest. It is well established in this circuit that a preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to all four elements.

*Davidoff & Cie, S.A. v. PLD Int'l Corp.*, 263 F.3d 1297, 1300 (11th Cir. 2001) (quotes, cites and alterations omitted), *quoted in Sony Computer Entertainment America Inc. v. Nasa Electronics Corp.*, 2007 WL 3130472 at * 1 (S.D.Fla. 10/24/07) (unpublished); *see also Freeway Ford, Inc. v. Freeway Motors, Inc.*, ___ F.Supp.2d ___, 2007 WL 1175827 at * 1 (M.D.Ga. 4/20/07); *The Freecycle Network, Inc. v. Oey,* ___ F.3d ___, 2007 WL 2781902 at

* 2 (9th Cir. 9/26/07); *General Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). A sliding scale may be used here:

> A preliminary injunction may be granted in a trademark case where the moving party demonstrates either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) the existence of serious questions going to the merits and that the balance of hardships tips sharply in [its] favor. These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. They are not separate tests but the outer reaches of a single continuum.

*Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007) (quotes and cites omitted).

### B. Lanham Act Standards

To be liable for trademark infringement under the Lanham Act, 15 U.S.C. § 1125(a),

> a person must (1) use in commerce (2) any word, false designation of origin, false or misleading description, or representation of fact, which (3) is likely to cause confusion or misrepresents the characteristics of his or another person's goods or services. 15 U.S.C. § 1125(a). The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse customers about the source of the products..... [E]ight nonexclusive factors [are] relevant to evaluating likelihood of confusion.

*Freecycle Network*, 2007 WL 2781902 at * 3. There is no cause of action under Lanham Act for "trademark disparagement," *id.* at * 4, and statements of opinion are not generally actionable under it. *Id.*

To succeed on the merits of a trademark infringement claim, then, the complaining party must show that the defendant used the plaintiff's mark in commerce without its consent and that unauthorized use was likely to deceive, cause confusion, or result in mistake. *Davidoff*, 263 F.3d at 1300-1301. The complaining party bears the burden of proof on all elements of a trademark infringement claim. *Levenger Co. v. Feldman*, ___ F.Supp.2d ___, 2007 WL 2781062 at * 11 (S.D.Fla. 9/21/07).

Courts evaluate claims in this area based on the purpose of the Lanham Act, which is primarily to prevent customer confusion.

> To understand what type of consumer confusion is actionable under the Lanham Trade-Mark Act, it is useful to review Congress' purposes for enacting trademark legislation. Congress sought to protect two groups: consumers and registered trademark owners. In protecting these groups lawmakers recognized that "[e]very product is composed of a bundle of special characteristics." Consumers who purchase a particular product expect to receive the same special characteristics every time. The Lanham Act protects these expectations by excluding others from using a particular mark and making consumers confident that they can purchase brands without being confused or misled. Thus trademark law ensures

consistency for the benefit of consumers.

*Davidoff*, 263 F.3d at 1301(cites omitted).

In determining likelihood of confusion under the Lanham Act, a court considers: "(1) the strength of the plaintiff's mark; (2) the similarity between the plaintiff's mark and the allegedly infringing mark; (3) the similarity between the products and services offered by the plaintiff and defendant; (4) the similarity of the sales methods, *i.e.*, retail outlets or customers; (5) the similarity of advertising methods; (6) the defendant's intent, *e.g.*, does the defendant hope to gain competitive advantage by associating his product with the plaintiff's established mark; and (7) the most persuasive factor on likely confusion is proof of actual confusion." *Freeway Ford*, 2007 WL 1175827 at * 2 (quotes and cite omitted). "The public interest is served by the entry of a preliminary injunction in a lawsuit under the Lanham Act to avoid confusion in the marketplace."[5] *Id.* 2007 WL 1175827 at * 7.

When a mark is unregistered, a party has the right to the use of the mark under the Lanham Act if the mark is either inherently distinctive or has acquired distinctiveness through secondary meaning. *Freeway Ford*, 2007 WL 1175827 at * 2. In order to establish trade *dress* infringement, a plaintiff must show: that the product is distinctive or has developed secondary meaning; that the features in question are nonfunctional; and that the resemblance between two products is confusingly similar. *Bauer Lamp Co., Inc. v. Shaffer*, 941 F.2d 1165, 1170 (11th Cir. 1991).

Irreparable harm exists in a trademark case when the moving party shows it will lose control over the reputation of its trademark pending trial. *McDonald's Corporation v. Robertson*, 147 F.3d 1301, 1310 (11th Cir.1998); *Sony*, 2007 WL 3130472 at * 2; *Freeway Ford*, 2007 WL 1175827 at * 7.

**C. Injunctive Relief In This Case**

GBL accurately sums up what is asked of this Court now, which is to determine intellectual property ownership rights: "The parties' briefs have now focused the dispute on the largely legal issue of who *owns* the intellectual property at issue." Doc. # 98 at 1 (emphasis added). GBL argues that "[t]he case law sets up a legal presumption, confirmed by the parties' agreements, that GBL owns the intellectual property associated with the products it manufactures." *Id.* So, GBL concludes, the Court should grant its preliminary injunction motion by enjoining BUSA. *Id.* at 2.

BUSA, in contrast, insists that it owns the intellectual property rights at issue, and it clarifies what it presently seeks: "a temporary injunction against [GBL's] use of:

(1) The following trademarks (the "Trademarks"):

VARIO
CRP
CERAPOST
CENTURY PACK; and

---

[5] "Georgia law [is] governed by the same standards as claims under the Lanham Act." *Pepsico, Inc. v. # 1 Wholesale, LLC*, 2007 WL 2142294 at * 2 (N.D.Ga. 7/20/07) (unpublished). Thus, "tradename claims under Georgia law involve the same dispositive issues as the claims under the Lanham Act." *Ferrellgas Partners, Inc. v. Barrow*, 2006 WL 372602 at * 2 (M.D.Ga. 2/16/02) (unpublished).

10

(2) The KOMET USA catalog."

Doc. # 99 at 1.

BUSA explains that it began "use of the Trademark CERAPOST in 1997, CENTURY PAK in 1989, VARIO in 1990, and CRF in 1992," when Brasseler USA was GBL's subsidiary. Doc. # 99 at 2. And "Versions 7 and 8 of the Brasseler USA catalog are derivations of Version 6 which was published in 1997." *Id.* The BUSA catalogs and the GBL/Komet catalogs were derived from the same "mother ship," BUSA insists, and thus BUSA's catalogs are a protected form of trade dress. *Id.* (citing *Tools USA & Equip. Co. v. Champ Frame Straightening Equip.*, 87 F.3d 654 (4th Cir. 1996)).

The Court concludes that BUSA has met all of the above-mentioned requirements for a preliminary injunction, and is entitled to the preliminary injunction it requests (in doc. # 99) to protect its trademarks. The record shows that on 1/1/00, GBL transferred its interest (its stock) in BUSA to Peter Brasseler, Jr. and other members of his family in exchange for his 50% ownership of GBL. That transaction unfolded over three documents, the Preliminary Agreement of July 2000, doc. # 80 exh. 6, the 8/28/00 Spin-Off Agreement, doc. # 91 exh. B, and the 9/19/00 Separation Agreement, doc. # 91, Exh. B; *see also* doc. # 78 exh. 1 (Waters Aff.). Nothing in the law or facts cited shows that the ownership transfer somehow stripped BUSA of its established goodwill, trademarks and trade dress, or otherwise caused the transfer of those assets to GBL.[6]

For that matter, the Court finds convincing the specific provisions of the parties' Trademark Agreement, *see Peter Brasseler Holdings, LP v. Gebr. Brasseler GmbH & Co., KG,* (Fulton

---

[6] As the Middle District recently explained:

> Where the entire stock of a business is purchased and the business continued under its original name, it must be presumed that the purchaser acquired the goodwill of the business together with the commercial symbols of that goodwill, the business' trademarks and trade names. *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.,* 871 F.2d 697, 700 (7 Cir.1989) ("Absent contrary evidence, a business trade name is presumed to pass to its buyer."); *Oklahoma Beverage Co. v. Dr. Pepper Love Bottling Co.,* 565 F.2d 629, 632 (10 Cir.1977) (concluding that trademark transferred with sale of entire business even though it was not mentioned in the sale contract and stating that "no particular words are necessary for the assignment when the business and the goodwill are transferred to another who continued the operation under the same trademark"); *Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, Inc.,* 75 F.2d 13, 15 (5 Cir.1935) ("Trademarks attach to and pass with the good will of a business, and, as appurtenant to it, they are freely and easily sold. No particular form of words is necessary to transfer them; they inhere in and pass with good will."); J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 18:37 (4th ed. 2005) ("When a business is sold as a going concern, the intent to transfer good will and trademarks to the buyer is presumed. Good will and trademarks are transferred even though not specifically mentioned in the contract of sale. That is, trademarks and the good will they symbolize are presumed to pass with the sale of a business .").

*Ferrellgas Partners,* 2006 WL 372602 at * 5.

County Superior Court, Georgia), 11/21/06 Hr. Tr. exh. 3 (acknowledging that GBL and BUSA were affiliated companies but split by way of a 9/19/00 agreement, a dispute arose over ownership of UCM- and non-UCM trademark usage, and the parties therefore resolved that dispute to "ensure that within the UCM [BUSA] is the sole owner of trademarks and trade names with the component 'Brasseler'... [etc.]").

While not binding precedent and not precisely on point, the Court finds applicable here *Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. App'x 180 (11th Cir. 2005) (Purchaser of all stock in corporation, which was going concern and continued to operate after sale under its original name, acquired goodwill of corporation together with commercial symbols of that goodwill, such as corporation's trademarks and trade names, for purpose of establishing substantial likelihood of success on motion for preliminary injunction; although clause in sale agreement said that there were no trademarks or trade names being used by corporation prior to sale, that clause merely warranted that corporation was not using anyone else's intellectual property at time of sale and thus it was presumed that mark remained with corporation when it was sold), *on remand*, 2006 WL 372602 at * 10 (summary judgment to plaintiff since it acquired ownership of the trademark and the adverse use of the mark by the former owner's daughter was likely to cause confusion), *reconsideration denied*, 2006 WL 1174440 (M.D.Ga. 5/2/06) (unpublished) cited in 1 FEDERAL UNFAIR COMPETITION: *Lanham Act* 43(a) § 10:4 (Nov. 2007).

BUSA is entitled to a preliminary injunction (neither side sought a permanent injunction, citing discovery to expire 12/9/07, *see* 11/15/07 Hr.Tr. at 4, 29-30) on all of its "VARIO," etc. claims set forth in doc. # 99 at 1.

In addition, the Court finds the Komet catalog in question confusingly similar, *see* doc. # 80 exh. 9-11, and it is apparent, as BUSA contends, doc. # 95 at 13, that GBL simply copied "Version 8." It is not sufficient to make "cover" changes when substantive internal content is confusingly similar, and BUSA has submitted sufficient evidence of customer confusion. *Id.* at 14, 17-18, 20; doc. # 95 Appx. (Akin Aff.). Significant here is the fact that Komet enjoys virtually no consumer recognition in the U.S., so it is entirely credible that it deliberately sought to copy BUSA's catalog while attempting to obscure that fact through cosmetic differentiation.[7]

Meanwhile, the Court agrees with BUSA that BUSA is not engaging in any deceptive advertising, in that, after the 2000 separation, the two companies operated at arms' length during their Supply Agreement period, and GBL freely consented to BUSA's sale of GBL-manufactured products as its own. Doc. # 78. That is, products purchased from GBL were *branded* with BUSA's trademark, and the Supply Agreement permitted this, along with BUSA's option to buy from others and re-brand as its own. BUSA, like Sears, was selling the quality-assurance that its name connoted, not its products' manufacturing provenance. GBL exaggerates the effect of the Supply Agreement's termination by ignoring the fact that BUSA, from the 2000 split agreement and later Trademark Agreement, retained the right to use the Brasseler name and all goodwill flowing from it.

---

[7] "Intent to copy in itself creates a rebuttable presumption of likelihood of confusion." *Bauer Lamp*, 941 F.2d at 1172; MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:123 (*Relationship between copying and likely customer confusion*) (Dec. 2007).

And, while it appears true that BUSA makes some exaggeration and pays insufficient attention to the distinction between "founder" Peter Brasseler Sr. versus Jr., *see* doc. # 74 exh. F, it cannot be said to cause undue substantive consumer confusion. Plus, given BUSA's long prior relationship with GBL, claiming some "German heritage" is neither false nor misleading. The same may be said for phrases like "Buy Direct," doc. # 74 at 9-10, which can mean through a direct sales force (as opposed to third-party distributors) *or* direct from a manufacturer. *See* Waters Aff. ¶¶ 14-20.

The Court finds the remainder of GBL's injunctive-relief claims similarly unavailing. While the Court is not definitively ruling on GBL's counterclaims (GBL's Copyright claims, incidentally, are not in play in the current preliminary injunction cross-motions, *see* doc. # 74 at 25 (seeking injunction only for "false advertising")), it is satisfied that GBL is not likely to succeed on the merits prong set forth above. In light of this result, it is not necessary to reach BUSA's "unclean hands" argument. *See* doc. # 78 at 22-25.

### IV. CONCLUSION

The Court ***GRANTS*** the motion (doc. # 80) of Peter Brasseler Holdings, L.P. and Brasseler USA, Inc.'s (BUSA's) for a preliminary injunction against defendants Gebr. Brasseler GmbH & Co. KG, Kobra, Inc., d/b/a/ Komet USA, and Komet USA, LLC (GBL). Pursuant to F.R.Civ.P. 65(d), defendants, their officers, agents, servants, employees and all persons acting in concert and participation with them, are preliminarily enjoined from using and distributing the above-described Komet catalog, in both printed and unprinted (Internet, etc.) form, and must recall, remove and destroy same. Defendants are also preliminarily enjoined from using the marks VARIO, CRF, CERAPOST and CENTURY PAK for dental and related products, and they must recall and destroy all products and advertising bearing such infringing marks in any form, electronic or otherwise.

This Order is, *nunc pro tunc* to 11/21/07, binding on the defendants within the scope set forth in Rule 65(d) -- hence, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise. The Court ***DENIES*** GBL's motion for a preliminary injunction. Doc. # 73.

This __17__ day of December, 2007.

/s/ B. Avant Edenfield
_____
B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA